# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JUDY SCHILLING

CIVIL ACTION

VERSUS

LOUISIANA DEPARTMENT OF                    NO. 12-00661-SDD-SCR
TRANSPORTATION AND DEVELOPMENT

## RULING

This matter is before the Court on two separate *Motions for Partial Summary Judgment*[1] filed by Defendant, Louisiana Department of Transportation and Development ("Defendant" or "DOTD"). Plaintiff, Judy Schilling ("Plaintiff" or "Schilling"), has filed *Oppositions*[2] to both motions, to which Defendant has filed *Reply Briefs*.[3] For the following reasons, DOTD's first *Motion for Partial Summary Judgment* shall be granted in part and denied in part, and DOTD's second *Motion for Partial Summary Judgment* shall be granted.

## I. INTRODUCTION AND PROCEDURAL HISTORY

Schilling began her career with DOTD on October 6, 1997. Within six years she was promoted to the full time position of Accounting Specialist II at District 62 in Hammond, Louisiana, where she remained for the duration of her employment.[4] It is undisputed that during her tenure at DOTD Schilling was a model employee, even being

---

[1] Rec. Doc. 21 and 22.
[2] Rec. Doc. 42 and 44.
[3] Rec. Doc. 45 and 46. Plaintiff filed a *Surreply Memorandum* (Rec. Doc. 49) in Response to DOTD's *Reply Memorandum* (Rec. Doc. 45).
[4] Rec. Doc. 22-3, pp. 10-11; Rec. Doc. 44-2, pp. 11-12.

named employee of the quarter in October of 2008.[5]  Schilling remained with DOTD for approximately 14 years until her termination effective May 16, 2012.[6]

During her employment with DOTD, specifically 2005 and 2006, Schilling was diagnosed with several illnesses, including rheumatoid disease, rheumatoid arthritis, West Nile Virus, and Bell's Palsy.[7]   In the latter part of 2011, Schilling was also diagnosed with degenerative disc disease.[8]   According to Schilling, these illnesses interfered with her ability to concentrate, as well as her mobility, and stress further exacerbates her conditions.

Schilling claims that in 2007 and 2008 she made four initial requests of her employer for reasonable accommodations while at District 62.  In 2007, Schilling made her initial request for a handicap parking spot near the rear entrance of the building because she believed it was closer to her office.[9]  In that same year, Schilling requested the installation of a door for her office to serve as a sound barrier.[10]  In March and April of 2008, Schilling's rheumatologist, Dr. Sean E. Shannon, sent two letters to DOTD requesting sound barriers on her behalf.[11]  In the April letter, Shannon also requested a change in Schilling's workweek "to allow her more recover[y] time on the weekends."[12] Schilling specifically requested a schedule change allowing her to work four (4) ten (10)

---

[5] Rec. Doc. 41-13, pp. 4-5.  In the recognition, Schilling was described as "one of District 62's greatest assets."  Rec. Doc. 41-13, p. 8.
[6] Rec. Doc. 22-8.  Non-Disciplinary Removal Notice.
[7] Rec. Doc. 44-2, pp. 16-21.  (Schilling testified she was diagnosed with rheumatoid disease in July of 2005, rheumatoid arthritis in November of 2005, West Nile Virus in September of 2006, and Bell's Palsy in September of 2006).
[8] Rec. Doc. 44-2, p. 21.
[9] Rec. Doc. 41-4, pp. 63-65.  Schilling reiterated this request in 2008. Rec. Doc. 41-4, p. 65.
[10] Rec. Doc. 41-4, p. 79. Schilling testified that her first request for the reinstallation of a door to her office was made in August of 2007.
[11] Rec. Doc. 44-5, pp. 44-45, and 57.  In the March letter he testified that the letter asked "Anything you [DOTD] could do to provide a less noisy environment for [Schilling] to focus and do her accounting."
[12] Rec. Doc. 44-5, pp. 57-58; Rec. Doc. 21-8, p. 2.

hour days per week with Mondays or Fridays off.[13]   In March of 2008, Schilling's chiropractor, D.C. Karen Carter, submitted a facsimile to Defendant asking that Schilling be permitted to wear comfortable or "slipper-like shoes" to work.[14]

On April 2, 2008, Schilling met with her supervisors, Sharon McKinney, and McKinney's supervisor, Ronda Rylatt, to discuss her requests.[15]   Notably, prior to this meeting, Schilling had been given a handicap parking spot across the street from her building.[16]   During the meeting, Rylatt offered Schilling the option of moving into other offices in the building that had doors and that she would not have to share with other co-workers.[17]   In this same meeting, Schilling expressed her desire for a schedule change of four (4) ten (10) hour days.  On May 1, 2008,  Schilling received an email from Shelia Tate, the District 62 Assistant District Administrator of the Business Office,[18] offering to change her work schedule to four (4) ten (10) hour days, Monday, Wednesday thru Friday (with Tuesdays off).[19]   Schilling declined the offer and explained she would continue working her schedule.

Another meeting was held in April of 2008 where Schilling, Rylatt, and McKinney were once again in attendance, with the addition of Tate and Connie Standige, the District Administrator.[20]   At the meeting, these individuals discussed Schilling's requests

---

[13] Rec. Doc. 41-4, p. 100.
[14] Rec. Doc. 41-4, pp. 71-72.
[15] Rec. Doc. 22-10. Rec. Doc. 41-4, p. 69.
[16] Rec. Doc. 41-4, p. 68.
[17] Rec. Doc. 22-10.
[18] Tate was appointed as the District 62 Assistant District Administrator of the Business Office on August 17, 2007.
[19] Rec. Doc. 22-10.  The change would have been effective as of May 5, 2008.
[20] Rec. Doc. 21-2, p. 1; Rec. Doc. 44-1, p. 3.

for a handicap parking spot, the installation of a door for her office, the schedule change, and her request to wear slipper-like shoes.[21]

Schilling contends that the DOTD failed to timely provide her with the requested reasonable accommodations, to engage in a good faith interactive process regarding her requests, or to make any showing that the accommodations would impose undue hardship on DOTD. Therefore, on April 15, 2009, Schilling filed an EEOC Charge against DOTD asserting she had been subject to discrimination based on disability, retaliation, and harassment.[22] On May 17, 2010, Schilling also filed a complaint with the Compliance Programs Office of DOTD alleging that she had been denied reasonable accommodations in her work environment, and that she had been subjected to harassment, retaliation, and a hostile work environment.[23] Approximately two years later, Schilling was terminated from her employment at DOTD.[24]

Upon receiving her Right to Sue Letter, on September 21, 2012, Schilling filed a state lawsuit asserting similar disability, harassment, and hostile work environment due to retaliation claims under the Americans with Disabilities Act ("ADA") and the Louisiana Employment Discrimination Law ("LEDL").[25] She also alleged that as a result of DOTD's failure to accommodate her requests, her conditions have worsened.[26] DOTD timely removed this case to federal court asserting subject matter jurisdiction pursuant

---

[21] Rec. Doc. 41-4, pp. 69; 74-75.
[22] Rec. Doc. 13-2, p. 6; Rec. Doc. 41-5, p. 41. Specifically she claimed to have been "discriminated against, harassed, and retaliated against in violation of the Americans with Disabilities Act for requesting reasonable accommodations." Rec. Doc. 41-5, p. 41.
[23] Rec. Doc. 22-7. After completing their investigation, the Compliance Programs Office issued a response to Schilling's complaint.
[24] Rec. Doc. 22-8. Schilling was non-disciplinarily removed from her position effective May 16, 2012.
[25] Rec. Doc. 1-1, pp., 3-5. *Schilling v. Louisiana Department of Transportation and Development*, 19th Judicial District Court, No. 615639, Section 23.
[26] Rec. Doc. 1-1, p. 3.

to 28 U.S.C. § 1331, and filed an *Answer*.[27]  Thereafter, Schilling filed an *Amended Complaint* in which she asserted claims of disability discrimination arising out of her second charge of discrimination filed with the EEOC on October 2, 2012.[28]  In particular, Schilling alleges that the no-fault leave policies that allow employers, such as DOTD, to terminate employees after exhaustion of leave is in violation of the ADA.[29]  DOTD subsequently answered her *Amended Complaint*.[30]

Pending before the Court are two separate motions for partial summary judgment filed by DOTD.  In its first motion, DOTD contends that it is entitled to judgment as a matter of law on Schilling's claims of failure to accommodate or failure to engage in the interactive process regarding her four initial requests made pursuant to the ADA.[31]  DOTD further argues that Plaintiff cannot prove the alleged failure to accommodate caused her health conditions to worsen, and that, as a matter of law, Schilling is not entitled to punitive damages.[32]  As for its second motion, DOTD asserts that it is entitled to judgment as a matter of law on Schillings' claims of harassment, retaliation, and emotional distress.[33]  Schilling has opposed both motions.

## II.  LAW AND ANALYSIS

### A.  Motion for Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[27] Rec. Doc. 1.  The state court *petition* was removed on October 19, 2012.
[28] Rec. Doc. 55. Schilling attached her Right to Sue letter dated April 9, 2014 to her *Amended Complaint*. Rec. Doc. 55-1.
[29] Rec. Doc. 55, p. 3.
[30] Rec. Doc. 56 (*Answer*).
[31] Rec. Doc. 21-1.
[32] Rec. Doc. 21-1.
[33] Rec. Doc. 22-1.

matter of law."[34]  "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[35]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[36]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[37]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[38]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[39]  All reasonable factual inferences are drawn in favor of the nonmoving party.[40]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[41]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the

---

[34] Fed. R. Civ. P. 56(a).

[35] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[36] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (5th Cir. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).

[37] *Rivera v. Houston Independent School Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[38] *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[39] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[40] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[41] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.""""[42]

## B. Admissibility of Schilling's EEOC File

In an effort to defeat both of DOTD's summary judgment motions, Schilling has relied upon various documents including the EEOC file.  In response, DOTD contends that the entire file, particularly the underlying material collected during an EEOC investigation,[43] is inadmissible to the extent it consists of inadmissible hearsay and unauthenticated documents.  DOTD takes particular issue with the content of Schilling's eighteen-page EEOC Charge of Discrimination.[44]  In contrast, Schilling contends the file is admissible under the public records exception to the hearsay rule and points out that DOTD has failed to identify any information or circumstances that would suggest a lack of trustworthiness under Rule 803(8)(c) of the Federal Rules of Evidence.  Schilling also argues that the content of the EEOC file have been verified by other evidence in this case through her own deposition testimony and those documents produced by DOTD during discovery.

Relying on *Smith v. Universal Services, Inc.*, the Court finds that it is required to take the EEOC investigative report into consideration when deciding a Title VII claim, because failure to do so would be "wasteful and unnecessary."[45]  In *Smith*, the Fifth Circuit explained that the EEOC investigative report, which consisted of "a summary of the charges, a brief review of the facts developed in its investigation, and [the EEOC's]

---

[42] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[43] DOTD challenges the admissibility of several documents that appear to have been submitted to the EEOC investigator, Tanya Darensbourg, by Schilling regarding her EEOC charge of discrimination and internal email correspondence between Schilling and other DOTD employees/supervisors.
[44] Rec. Doc. 41-5, pp. 41-58.
[45] 454 F.2d 154, 157 (5th Cir. 1972).

finding," would be admissible under the business records exception to the hearsay rule. As a word of caution, however, the decision of the EEOC is non-binding on this Court.[46] As for Schilling's *Charge of Discrimination*, the Court finds that because Schilling signed said document, it is admissible as a sworn statement. However, to the extent the *Charge of Discrimination* contains inadmissible summary judgment evidence, the Court shall disregard those portions.[47] The fact that certain documents within the EEOC file were produced as part of the discovery process by DOTD does not deem them *per se* admissible for evidentiary purposes.[48] Nonetheless, the Court finds that to the extent the contested documents, specifically email correspondence, have been authenticated by deposition testimony they shall be considered for summary judgment purposes.[49]

### 1. Analysis of DOTD's First Partial Summary Judgment

In its first motion, DOTD contends that it is entitled to judgment as a matter of law because the evidence fails to establish a *prima facie* case for failure to accommodate under the ADA. Specifically, DOTD argues that Schilling cannot show that it failed to accommodate or to engage in the interactive process regarding her four initial requests for accommodations made pursuant to the ADA.[50] DOTD further argues that Plaintiff cannot prove the alleged failure to accommodate caused her health conditions to worsen, and that, as a matter of law, Schilling is not entitled to punitive damages.

### a. Prescription

---

[46] *Id.*

[47] *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 530-31 (5th Cir. 1992)("On a motion for summary judgment, the district court should disregard only those portions of than affidavit that are inadequate and consider the rest.").

[48] *Railroad Management Co., L.L.C. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 221 ("Not all discoverable material is admissible.").

[49] The Court notes that some of the email correspondences were actually produced by DOTD in support of their own motions for partial summary judgment.

[50] Rec. Doc. 21-1.

DOTD argues that Schilling's ADA claims for failure to accommodate her work schedule and failure to engage in the interactive process prior to June 19, 2008 are time-barred by the statute of limitations. Schilling counters that, under the continuing violation doctrine, her claims are still viable.

Before a plaintiff may file a civil action under the ADA, she must exhaust administrative remedies, which includes filing a charge of discrimination with the EEOC within 300 days after the alleged violations occurred and filing a suit within 90 days after receiving a Right to Sue Letter from the EEOC. However, "a continuous and ongoing violation tolls the statute of limitations; statutes of limitations are meant to prevent 'stale claims,' and if the violation is a continuing one 'the staleness concern disappears.'"[51] Under the "continuing violation doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period."[52] Notably, the Fifth Circuit has echoed the Supreme Court's message, "that discrete discriminatory acts are not actionable if time barred, even when they are related to acts complained of in timely filed charges."[53]

Whether a continuing violation has occurred "turns on the facts and context of each particular case."[54] In order to reach a determination, the Fifth Circuit has instructed that the following three factors are relevant for the Court's consideration: subject matter

---

[51] *Pagan-Negron v. Seguin Independent School Dist.*, 974 F.Supp.2d 1020, 1033 (W.D. Tx. 2013)(quoting *McGregor v. Louisiana State Univ. Bd. of Sup'rs.*, 3 F.3d 850, 867 (5th Cir. 1993)(quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

[52] *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed.Appx. 387, 391 (5th Cir. 2005)(citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)).

[53] *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

[54] *Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th Cir. 1989)(quoting *Berry v. Bd. of Supervisors of Louisiana State Univ.*, 715 F.2d 971 (5th Cir. 1983), *cert denied* 479 U.S. 868, 981 (1986)).

("Do the alleged acts involve the same type of discrimination?"); frequency ("Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision?"); and degree of permanence ("Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?").[55]

Considering these factors, the Court finds that in the case at bar the facts do not support a finding of a continuing violation. In her deposition testimony, Schilling stated that the last time she requested an accommodation of working four (4) ten (10) hour days with either Monday or Friday off was in April of 2008.[56] In response to her request, on May 1, 2008, Tate offered Schilling a work schedule of four (4) ten (10) hour days with Tuesday being her day off.[57] Schilling declined DOTD's offer, and expressed that she would keep her schedule as is; her schedule consisted of four nine hour days and half of a day on Friday.[58]

Based on the evidence, Schilling did not request another schedule change until another six months had lapsed, when Tate decided to change all employees' schedules in the business section to five (5) eight (8) hour days effective November 3, 2008.[59] At this time, Schilling contacted Cindy Cardwell, DOTD's Human Resources Analyst, directly to request a return to her four nine hour days with half a day on Friday schedule,

---

[55] *Berry v. Bd. of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983), *cert denied* 479 U.S. 868, 981 (1986) "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights." *Messer v. Meno*, 130 F,3d 134-35 (5th Cir. 1997)(quoting *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1560-61 (5th Cir. 1985)).

[56] Rec. Doc. 21-3, pp. 21-22.

[57] Rec. Doc. 21-3, pp. 13-14; Rec. Doc. 22-10, p. 2; Rec. Doc. 41-4, p. 182.

[58] Rec. Doc. 41-4, pp. 106-107.

[59] Rec. Doc. 21-6, pp. 2-3; Rec. Doc. 21-17, p. 2; Rec. Doc. 41-4, p. 183; Rec. Doc. 41-4, p. 219.

which Schilling reiterated in December of 2008.[60]  Moreover, according to Schilling, she explained to Cardwell that she did not think she could handle working ten hour days at this point.[61]  Schilling's second request was granted, albeit, not until May of 2009.[62]  The Court finds that based on the evidence, Schilling's infrequent requests for accommodations in her work schedule "[are] the sort of discrete and salient event[s] that should put an employee on notice that a cause of action has accrued."[63]  The Court therefore, finds the continuing violation doctrine inapplicable to Schilling's failure to accommodate and to engage in the interactive process claims arising out of her April 2008 request for a schedule change. Thus, DOTD's first *Motion for Partial Summary Judgment* will be granted on this claim.

b.  Remaining Failure to Accommodate Claims under the ADA[64]

DOTD contends that Schilling's remaining failure to accommodate claims— requests for the installation of a door for her office, the ability to wear slipper-like shoes or footwear to work, a handicap parking space, and her second requested schedule change—must be dismissed due to an absence of genuine issue of material fact. Schilling counters that she has identified admissible evidence that raises a genuine issue of material fact as to whether she was denied reasonable or adequate accommodations based upon her requests.

"[A] plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a 'qualified individual with a disability;' (2) the

---

[60] Rec. Doc. 21-16, p.2; Rec. Doc. 41-4, pp. 201-202.
[61] Rec. Doc. 41-4, p. 201.
[62] Rec. Doc. 21-18, pp. 2-3.
[63] *Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir. 1998).
[64] The Court notes that failure to accommodate claims under the ADA are distinct from claims of disparate treatment.  42 U.S.C. Sections 12112(a), (b)(5)(A).

disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations."[65]   Pursuant to the ADA, a qualified individual with a disability means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[66]   "The ADA further defines an actionable disability, in relevant part, as 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[67]

In general, it is the employee's burden to make his need for an accommodation known to his employer.[68]   Under the ADA, reasonable accommodations may include the following:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers and interpreters, and other similar accommodations for individuals with disabilities.[69]

Notably, the plaintiff "bears the initial burden of proof on the issue of reasonableness, but need only show that the proposed accommodation is reasonable 'in the run of cases.'"[70]

---

[65] *Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013).
[66] *Burch v. Coca-Cola Co.*, 119 F.3d 305, 315 (5th Cir. 1997)(quoting 42 U.S.C. § 12111(8)).
[67] *Id.* (quoting 42 U.S.C. § 12102(2)(A)).
[68] *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 112 (5th Cir. 2005).
[69] 42 U.S.C. § 12111(9).
[70] *Windhauser v. Bd. of Supervisors, for LSU A & M*, 360 Fed.Appx. 562, 567 (5th Cir. 2010)(unpublished)(quoting *Riel v. Elec. Data Syst. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996)).   However, an employer may defend its failure to implement a reasonable accommodation by showing business necessity or undue burden. *Riel v. Electronic Data Systems Corp.*, 99 F.3d 678, 682 (5th Cir. 1996).

"Once the employee presents a request for an accommodation, the employer is required to engage in the interactive process so that together they can determine what reasonable accommodations might be available."[71]   The interactive process has been defined as "a meaningful dialogue with the employee to the find the best means of accommodating that disability."[72]   Such a process requires "communication and good-faith exploration."[73]   Ultimately, the precise 'contours of the interactive process must be determined on a case-by-case basis."[74]   However, "[w]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."[75]   "But if the breakdown of the interactive process is traceable to the employee rather than the employer, there is no violation of the ADA."[76]

### i. Does Schilling Have an Actual Disability Under the ADA?

In its *Reply Brief*, DOTD contends for the first time that Schilling cannot satisfy the first element necessary to establish her *prima facie* case because she is not disabled under the ADA.[77]   While DOTD does not dispute Schilling's diagnoses, it does contend that her illnesses do not substantially limit one or more major life activity.

---

[71] *Molina v. DSI Renal, Inc.*, 840 F.Supp.2d 984, 1002 (W.D.Tx. 2012)(quoting *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d at 622 (5th Cir. 2009)(emphasis added)(citation omitted)). *See also*, *Cutrera*, 429 F.3d at 112 (5th Cir. 2005).

[72] *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th 2009)(quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)) (hereinafter "*Chevron Phillips*").

[73] *Id.* (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)).

[74] *Suggs v. Central Oil of Baton Rouge, LLC*, 2014 WL 3037213, *13 (M.D.La. July 3, 2014)(quoting *Picard v. St. Tammany Hosp.*,611 F.Supp.2d 608, 621(E.D.La. 2009)).

[75] *Loulseged v. Azko Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

[76] *Suggs v. Central Oil of Baton Rouge, LLC*, 2014 WL 3037213, *13 (M.D.La. July 3, 2014)(quoting *Loulseged v. Azko Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

[77] In its original *motion*, DOTD did not challenge Schilling's status as being disabled under the ADA. Instead, DOTD provided in footnote 16 that it "reserves the right to raise the issue of whether Plaintiff has a disability at the trial of this matter and, solely for the purposes of this motion, assumes *arguendo* that Plaintiff has a disability."   Nevertheless, in its Reply Brief, DOTD argued this very point.   Because Schilling was permitted to file a *Sur-Reply* in which she addressed this argument, the Court will consider the merits.

DOTD rests its argument on the EEOC investigator's report wherein he concluded that Schilling was not substantially limited in the major life activities during the period in question.[78] As the Court previously explained, the EEOC's investigative report will be considered, although it is non-binding.[79]

The ADA prohibits discrimination against a "qualified individual with a disability," and discrimination includes "not making reasonable accommodations to known physical or mental limitations of an otherwise qualified" individual with a disability.[80] Although Schilling's claims occurred before the ADA Amendments Act of 2008 went into effect, the fundamental definition of disability under the ADA has remained unchanged and is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.[81]

A "physical impairment" under the EEOC regulations was defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-

---

[78] Rec. Doc. 44-3, JTS EEOC 000019; Rec. Doc. 45, p. 3.

[79] *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1972)("It is not to be denied that under Title VII, the action of the EEOC is not an agency action of a quasi-judicial nature which determines the rights of the parties subject only to the possibility that the reviewing courts might conclude that the EEOC's actions are arbitrary, capricious or an abuse of discretion. Instead, the civil litigation at the district court level clearly takes on the character of a trial de novo, completely separate from the actions of the EEOC. It is thus clear that the [investigation report] is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial.")

[80] 42 U.S.C. §§ 12112(a), 12112(b)(5)(A).

[81] Under pre-amendments, proper citation 42 U.S.C. § 12102(2). It is now codified in 42 U.S.C. § 12102(1).

urinary; hemic and lymphatic; skin; and endocrine."[82]   Nevertheless, as the Fifth Circuit has explained, "[m]erely having an impairment … does not make one disabled for the purposes of the ADA.   Plaintiffs also need to demonstrate that the impairment substantially limits a major life activity."[83]

"The implementing regulations in 29 C.F.R. § 1630.2(i) provide a non-exhaustive list of major life activities, which include 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."[84]   In *E.E.O.C. v. Chevron Phillips Chemical Co., L.P.*, a pre-amendment case, the Fifth Circuit further found that sleeping and thinking were also major life activities because these activities were of central importance to daily life.[85]   In reaching its decision, the *Chevron Phillips* court sought guidance from the 2008 EEOC compliance manual which provided that "mental and emotional processes such as thinking, concentrating, and interacting with others are other examples of major life activities."[86]

In order to qualify as a "substantial limitation" a person must either "be unable to perform a major life activity that the average person in the general population can perform or be significantly restricted in the ability to perform it."[87]   The EEOC advises courts to weigh the following factors when determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment,

---

[82] *E.E.O.C. v. Chevron Phillips Chemical*, 570 F.3d 606, 614 (5th Cir. 2009)(quoting 29 C.F.R. § 1630.2(h)(1)).
[83] *Id.*
[84] *Williamson v. American National Ins. Co.*, 695 F.Supp.2d 431, 449 (S.D.Tx. 2010)(quoting 29 C.F.R. § 1630.2(i); *Id.*)
[85] *Chevron Phillips*, 570 F.3d at 616.
[86] *Id.*
[87] *Id.* at 614 (citing 29 C.F.R. § 1630.2(j)).

(ii) its duration or expected duration, and (iii) its permanent or expected permanent long-term impact."[88]

Schilling was diagnosed with rheumatoid disease in July of 2005, rheumatoid arthritis in November of 2006,[89] and West Nile Virus and Bell's Palsy in September of 2006.[90] Schilling testified that in 2006, the rheumatoid arthritis caused her pain, stiffness, and swelling in her hands (up to her elbows) and in her feet (up to her knees), which only worsened over time affecting other parts of her body (i.e., shoulders and hips).[91] Schilling's rheumatologist, Dr. Sean Shannon, testified that rheumatoid arthritis will not improve over time.[92] Dr. Shannon also testified that in September of 2008, he diagnosed Schilling with fibromyalgia.[93] He further explained that the requested sound barrier for her office and the change in her work schedule in an effort to manage the fibromyalgia by reducing stress in Schilling's work environment.[94] According to Dr. Shannon by managing the fibromyalgia, Schilling's rheumatoid arthritis would, in effect, be managed as well.[95]

Schilling's treating chiropractor, Karen Carter, D.C., explained that she too began treating Schilling initially in 2006 for her lower back and hip pain, as well as neck and shoulder pain associated with her rheumatoid arthritis and West Nile.[96] D.C. Carter also

---

[88] *Id.*
[89] Rec. Doc. 44-5, pp. 10-11.
[90] Rec. Doc. 44-2, pp. 20-21; Rec. Doc. 44-5, p. 14.
[91] Rec. Doc. 44-2, pp16-17; 34.
[92] Rec. Doc. 44-5, pp. 16-17. Schilling's rheumatologist also diagnosed her with fibromyalgia but this was not included in her *Petition.* Her doctor specifically requested sound barrier for her fibromyalgia to help Schilling be more productive at work. According to Dr. Shannon, by managing Schilling's fibromyalgia, her arthritis (discomfort) and stress level would also be managed. Rec. Doc. 44-5, p. 48-50.
[93] Rec. Doc. 44-5, p. 24.
[94] Rec. Doc. 21-8.
[95] Rec. Doc. 44-5, p. 50. He also stated, "if there's a level of rheumatoid arthritis activity, fibromyalgia is going to make it a lot more unbearable." *Id.*
[96] Rec. Doc. 41-6, pp. 16-17; Rec. Doc. 41-6, p. 27. Dr. Carter stated that she saw Schilling every other week from 2007 to 2012. Rec. Doc. 41-6, p. 36.

diagnosed and treated Schilling for sciatic neuralgia—"irritation and inflammation of the sciatic nerve which comes off the lumbar spine, branches out, goes down the buttock, can go down the lateral side of the leg, all the way down into the calf into the foot and it also has a branch that comes across the top of the hip and can come across the groin area into the front area…[it is] the largest nerve of the body."[97]   D.C. Carter testified that in treating West Nile cases, stress would aggravate the condition.[98]   D.C. Carter further explained that she "kn[e]w for a fact in clinically treating [her] patients with chronic pain, they mentally are not as sharp and wear down.  Their concentration is less."[99]   She also testified that at times Schilling's health conditions could have affected her ability to work and her quality of life outside of her job.[100]   According to Carter, West Nile, rheumatoid arthritis, and sciatic neuralgia or neuritis will never go away.[101]

In 2006 through 2007, Schilling testified that, when she experienced swelling in her feet, she could not walk.[102]   Schilling further testified that, as a result of the West Nile Virus in 2008, she suffered problems with her ability to concentrate, motor skills (e.g., ability to walk and type), and standing, as well as sciatic nerve damage.[103]   Due to her inability to concentrate and her loss of motor skills, Schilling further testified that she had trouble working.[104]   However, in an effort to improve her mobility, Schilling also

---

[97] Rec. Doc. 44-2, pp. 22-23; Rec. Doc. 41-6, pp. 17-18
[98] Rec. Doc. 41-6, p. 17.
[99] Rec. Doc. 41-6, p. 58.  Although D.C. Carter did not make the request, she explained that Schilling expressed her desire for a door to her office to avoid constant interruptions.
[100] Rec. Doc. 41-6, pp. 72.
[101] Rec. Doc. 41-6, p. 35.
[102] Rec. Doc. 44-2, p. 18.
[103] Rec. Doc. 44-2, pp. 17-18.
[104] Rec. Doc. 44-2, p. 22. ("I suffered great concentration problems during and after the West Nile virus.  I was under a lot of stress at work with noise.  I had lost, also, motor skills.  I had also suffered with my sciatic nerve.  I had trouble walking.  I had trouble – and – I – I – that would – I means, I suffered with these things to the point – we had a lot of noise in the office.  That created a lot of stress on me trying to concentrate on my job and making sure that my T's were crossed and my I's were dotted.  And in my case, that the decimal points was in the right position.  I had trouble doing my work because of it.")

testified that she used a cane to assist her with her balance.[105]  It is also in 2008 when

Schilling testified to have great difficulty sleeping due to the extreme pain she was in as

a result of the rheumatoid disease, rheumatoid arthritis, and West Nile.[106]  Additional

evidence shows that DOTD was aware of Schilling's health conditions and

acknowledged receiving reports from her physicians documenting her health

conditions.[107]

The Court finds that, based on the summary judgment evidence, Schilling has

created a genuine issue of material fact as to whether she was substantially limited in

the major life activities including thinking or concentrating, sleeping, walking, and

working.  Accordingly, DOTD's motion shall be denied as to whether Schilling qualifies

as being disabled under the ADA.[108]

### ii.  Did DOTD Provide Reasonable Accommodations to Schilling?

DOTD argues that summary judgment is appropriate as to Schilling's failure to

accommodate claims.  DOTD contends that it accommodated Schilling's requests for a

second schedule modification request, to wear slipper-like shoes, for the installation of a

door for her office, and a handicapped parking space.  DOTD further argues that based

on the evidence, Schilling's claim for failure to engage in the interactive process must

also be dismissed.  Additionally, DOTD argues that, as a matter of law, Schilling is not

entitled to punitive damages for her ADA claims.

---

[105] Rec. Doc. 44-2, p. 23.
[106] Rec. Doc. 44-2, p. 23.
[107] Rec. Doc. 44-9.  Ronda Rylett, Administrative Program Manager III who supervised the business section of DOTD, testified that Schilling turned in reports from her physicians documenting her health conditions.  Rec. Doc. 44-9, p. 16.  She testified that Schilling had been diagnosed with West Nile and had problems concentrating, back pain, and rheumatoid arthritis.
[108] DOTD, the moving party, has not argued or satisfied its burden of showing there is no genuine issue of material fact as to whether Schilling was qualified for her position.  In other words, DOTD has not argued that Schilling was unable to perform her job duties or that she was discharged for performance-based reasons.  DOTD's argument is focused solely on whether Schilling has a disability.

a. <u>Schilling's Request for Schedule Modification</u>[109]

In her opposition memorandum, Schilling contends that in October of 2008 she contacted Candy Cardwell at DOTD headquarters about her request to work four (4) ten (10) hour days with either Monday or Friday off.[110] The Court finds that the evidence does not support Schilling's contention. In fact, in her deposition, Schilling testified that the last time she ever requested such a work schedule was in April of 2008.[111] The evidence does show, however, that after Schilling's supervisor, Shelia Tate, changed all business section employees' work schedules to five (5) eight (8) hour work days (effective November 3, 2008),[112] Schilling then requested that her schedule revert back to four (4) nine (9) hour days with half a day on Friday.[113] An email sent by Cardwell on Schilling's behalf on December 5, 2008 includes Schilling's December 1, 2008 request for a modified work schedule: "I would like to request that my old schedule be returned to me. The schedule I am requesting is to work Monday thru Thursday from 7:00 am to 4:30 pm, and on Friday from 7:00 am to 11:00 am."[114] Cardwell also testified that a few

---

[109] As previously found by the Court, Schilling's April of 2008 request for a schedule modification of four (4) ten (10) hour work days with Monday or Friday off has prescribed.

[110] Rec. Doc. 44. Cardwell worked as a labor management consultant for DOTD, whereby she would serve as a liaison between DOTD and the Department of Labor. Rec. Doc. 41-9, pp. 8-9.

[111] Rec. Doc. 41-4, pp. 113-114.

[112] Rec. Doc. 41-4, p. 219. Email dated October 23, 2008 from Shelia Tate regarding work schedules. "Effective pay period beginning on November 3, 2008, all employees in the business section will work 5, eight hour days, alternating times, 7:00am -3:30pm, one week and 7:45am-4:15pm the other week."

[113] Rec. Doc. 41-9, pp. 48 and 52. (Copies of email from Cardwell to her supervisor Linda Peloquin are attached to Cardwell's deposition).

[114] Rec. Doc. 41-9, pp. 48 and 52. (Copies of email from Cardwell to her supervisor Linda Peloquin are attached to Cardwell's deposition).

weeks prior to sending this email she also spoke directly with Tate and recommended that Schilling's request be granted.[115]

While the evidence shows that in February of 2009 a decision was made allowing all employees to return to their four ten hour day work weeks, Schilling has offered no evidence to support her position that she "persistently requested again the ten-hour workweek with her off day either being Monday or Friday." [116] The Court further finds that the evidence shows that all employees in the business section were allowed to return to their four (4) ten (10) hour day requests in the spring of 2009; however, none of the evidence shows that Schilling sought such a schedule change at that time. Instead, in May of 2009, Schilling was allowed to revert back to her four (4) nine (9) hour days with one half day as she had requested in December of 2008.[117] Alternatively, DOTD's summary judgment evidence establishes that the Plaintiff declined an offer of four (4) ten (10) hour work days. Hence, any alleged failure of a meaningful interactive process is traceable to the Plaintiff. Accordingly, the Court finds that Schilling has failed to create a genuine issue of material fact as to whether DOTD reasonably accommodated her four (4) ten (10) hour work day schedule request.

b. Schilling's Remaining Accommodation and Interaction Claims

DOTD contends that, even though it did not provide Schilling with a handicapped parking spot at the rear of the building when she initially requested it in July of 2007, it accommodated her because she was provided with a designated handicapped parking space eight months later. Schilling testified that she sought a handicapped parking spot

---

[115] Rec. Doc. 41-9, pp. 26-27. Cardwell testified that she was not a decision-maker as to request for reasonable accommodations; instead, she was to explain the law and make suggestions to the DOTD supervisors. Rec. Doc. 41-9, p. 25.
[116] Rec. Doc. 41-4, pp. 213 and 200; Rec. Doc. 41-5, pp. 98-99.
[117] Rec. Doc. 41-13, pp. 9-10.

in the back of the building because "it helped [her] get into the building with less difficulty."[118]   As previously discussed, she has offered additional testimony that her health conditions impaired her mobility.  Nevertheless, the parking spot DOTD provided to Schilling was located across the street from the main building.   DOTD is correct in its position that, while the ADA provides a right to reasonable accommodation, the accommodation does not have to be the employee's preferred accommodation.[119]  However, the Court finds that Schilling has presented evidence that creates a genuine issue of material fact as to whether the handicapped parking spot provided to her in March of 2008 was a reasonable accommodation.[120]   The Court further finds that a reasonable trier of fact could conclude that DOTD failed to engage in the interactive process with Schilling as to her initial request for a handicapped parking spot.[121]   As previously discussed, once an employee makes a request for an accommodation, the employer is required to engage in the interactive process, and "[a] party that obstructs or delays the interactive process is not acting in good faith."[122]  Schilling has produced evidence that shows that at least eight months lapsed before she received a handicap parking spot and, during this time, there is no evidence showing that DOTD engaged in

---

[118] Rec. Doc. 41-4, p. 71.

[119] *E.E.O.C. v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990)(If accommodation offered is reasonable, employee cannot insist upon specific or more beneficial accommodation.)

[120] In particular, Schilling has offered evidence showing that after suffering a broken knee, she was ultimately given a handicapped parking spot near the rear of the building in 2009.

[121] Rec. Doc. 41-4, p. 71.  Aside from Schilling's own request for a handicapped spot in the back of the building, Schilling testified that no one at District 62 or at DOTD Headquarters made any other suggestions about how she could get into the building at District 62 with less difficulty.  Rec. Doc. 41-4, pp. 65-68.

[122] *Manthos v. Jefferson Parish*, 2008 WL 3914988, at *6 (E.D.La. Aug. 21, 2008)(quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).  See also, *Louiseged v. Akzo Nobel Inc.*, 178 F.3d 731, n. 6 (5th Cir. 1999) ("The panel in Beck noted that a party 'that obstructs or delays the interactive process' may be charged with its breakdown.  In Beck and many employment cases, the employee continues working in a capacity arguably needing accommodation while the interactive process is ongoing.  An employer that dragged its feet in that situation could force the employee to work under suboptimal conditions, 'simply document the employee's failures,' and use the employee's difficulties as an excuse to terminate her."(internal citations omitted)).

the interactive process in the intervening eight months.[123]  Accordingly, the Court finds

that DOTD's motion shall be denied as to Schilling's claims for reasonable

accommodation and failure to engage in the interactive process based on her request

for a handicapped parking space.

DOTD also contends that Schilling cannot prove that it failed to accommodate

her request to wear slipper-like shoes.  The evidence shows that Schilling's treating

chiropractor recommended that she be permitted to "wear lightweight, non-binding

footwear, something slipper-like … to keep compression off of her legs and feet, while

seated at a desk."[124]  D.C. Carpenter made this suggestion because loose-fitting shoes

provided Schilling's legs relief while working in her sedentary job position.[125]  DOTD

argues that it granted this request, and Schilling was allowed to wear slipper-like shoes

at her desk and in her office at all times.[126]  Schilling has provided admissible evidence

that directly contradicts DOTD's position.[127]  Because "[c]redibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are

jury functions, and not those of a judge," the Court finds that whether DOTD

accommodated Schilling's request to wear slipper-like footwear cannot be resolved at

the summary judgment stage.[128]  The Court further finds that the evidence submitted by

Schilling could lead a reasonable juror to conclude that DOTD did not engage in the

interactive process regarding Schilling's request to wear slipper like shoes.[129]

---

[123] Rec. Doc. 44-2, pp. 63-65.
[124] Rec. Doc. 41-6, p. 145.
[125] Rec. Doc. 41-6 p. 86.
[126] Rec. Doc. 21-10, p. 2; Rec. Doc. 21-5, pp. 52-53.
[127] Rec. Doc. 41-4, p. 184.  Schilling testified that she was never granted the requested accommodation to wear slipper-like footwear.  Rec. Doc. 41-1. Ronda Rylatt also testified that Schilling's request to wear slipper-like shoes when she left her particular office area was not granted.  Rec. Doc. 41-11, p. 24.
[128] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).
[129] Rec. Doc. 41-11, p. 35.

Accordingly, DOTD's motion shall be denied to the extent it argues that it provided reasonable accommodations and engaged in the interactive process regarding Schilling's request to wear slipper-like shoes in the workplace.

Additionally, DOTD asserts that Schilling's failure to accommodate claims arising out of her request for the re-installation of a door to her office warrant dismissal on summary judgment. In early August of 2007, Schilling made her initial request to Ronda Rylatt, Business Office Manager, for the reinstallation of the door to her office; Rylatt approved Schilling's request at that time.[130] Schilling explained that she needed this accommodation to facilitate her ability to concentrate and eliminate or reduce distracting noises from within the outer business offices and hallway areas.[131] In her deposition, Rylatt explained that Schilling's office previously had a door on it that had been removed several years before, and had been destroyed.[132] In December of 2007, DOTD carpenters informed Rylatt that they had found another door and were ready to install it, but they needed a new request. Therefore, Rylatt sought approval from Tate who had been selected to serve as the District 62 Assistant District Administrator of Business on August 17, 2007. According to Rylatt, Tate refused to sign the request because "she was not going to segregate one employee out from the rest of the employees."[133] In her December 6, 2007 email to both Rylatt and McKinney, Tate further explained that "[s]eparating two employees from the rest of the office goes against what I am trying to accomplish. And, as I stated to Ronda, it is not fair to give

---

[130] Rec. Doc. 41-14, pp. 74 and 76.
[131] Rec. Doc. 41-14, p. 74.
[132] Rec. Doc. 41-11, p. 7.
[133] Rec. Doc. 41-11, p. 9.

some employees an isolated office, while the rest are in cubicles."[134]  Tate further suggested that if there is noise in the main hallway, the door to the business office could be closed, or a sign could be posted on the main door which stated "something to the effect of 'Quiet, please—employees working.'"[135]  In her affidavit, Tate also attested to advising Rylatt that Schilling "could be given some ear plugs."[136]

Upon learning of Tate's denial of her request, Schilling submitted an email to Rylatt and McKinney seeking reconsideration of this decision, further explaining her medical conditions and need for concentration in her job position.[137]  According to Schilling, she received no response to her reconsideration request.[138]  However, Connie Standige testified that she did have a conversation with Schilling about the noise concerns in response to her reconsideration request.[139]  Standige testified that she instructed other DOTD employees using Nextel two way radios not to talk on their radios in the office anymore to reduce the noise in the business office.[140]

In March and April of 2008, Schilling's rheumatologist, Dr. Shannon, also submitted two written requests to DOTD for the installation of a "sound barrier between her and a noise filled environment" to assist her with ability to concentrate and increase her productivity; in the latter letter, Dr. Shannon specifically referenced a door as one such sound barrier.[141]  On April 2, 2008, Rylatt attested to the fact that she, Schilling, and McKinney met where she offered several different offices with doors for Schilling to use, but Schilling "was not capable of making a decision that day" so she told Schilling

---

[134] Rec. Doc. 41-14, pp. 74-75.
[135] Rec. Doc. 41-14, p. 74.
[136] Rec. Doc. 21-6, p. 2.
[137] Rec. Doc. 41-14, p. 76.
[138] Rec. Doc. 44-3, p. 71.
[139] Rec. Doc. 21-5, p. 35.
[140] Rec. Doc. 21-5, p. 36.
[141] Rec. Doc. 21-7 and 21-8.

to think about it.[142]   In contrast, Schilling testified that, although McKinney told her that DOTD was "thinking about offering [her] an office across the hallway," this thought never materialized.[143]   The evidence shows that Schilling spoke with Cardwell about her request for a door later that year, which triggered Cardwell emailing both Tate and Linda Peloquin, Headquarters Human Resources Employee Relations Manager,[144] about Schilling's requests, including reinstallation of her office door.[145]   In 2010, Schilling along with other DOTD employees contacted the DOTD compliance office in Baton Rouge to discuss their individual complaints and had at least one meeting with them.[146] Inevitably, in February of 2011, DOTD sent Schilling a letter stating "[w]e are installing a door leading to your work area to minimize outside noise."[147]   The door was reinstalled on March 10, 2011, approximately one month before the EEOC site inspection was initially scheduled.[148]

DOTD argues that because it made other suggestions in response to Schilling's request for the reinstallation of a door to her office (i.e., posting of a sign on the main door stating "Quiet Please—Employees Working"; moving Schilling to an office across the hallway with a door; relocating other employees so Schilling could have an office with a door), it provided her with reasonable accommodations as required by the ADA.[149]   Hence, DOTD submits that it not only offered reasonable accommodations to

---

[142] Rec. Doc. 21-20.

[143] Rec. Doc. 41-4, p. 89.   She further testified that no one else offered her another office.

[144]   Susan Pellegrin testified that Linda Peloquin supervised Cardwell and was responsible for "the employee grievance process and served as a discipline specialist also, and she also supervised the trainer."  Rec. Doc. 41-10, p. 19.

[145] Rec. Doc. 44-12, p. 90.

[146] Rec. Doc. 41-12, pp. 4-6; Rec. Doc. 41-5, p. 72.

[147] Rec. Doc. 44-10, pp. 10 and 15.

[148] Rec. Doc. 41-5, p. 27.

[149] Rec. Doc. 21-5, pp. 39 and 90; Rec. Doc. 21-6, p. 2; Rec. Doc. 41-5, p. 249; Rec. Doc. 41-11, pp. 59-60.

Schilling's request, but that Schilling's refusal to accept these reasonable accommodations was unjustified and demonstrated her refusal to engage in the interactive process.

As previously noted, all inferences must be viewed in a light most favorable to the non-movant. The Court finds that Schilling has provided evidentiary support that creates a genuine issue of material fact as to whether DOTD did, in fact, offer any alternative accommodations and whether these accommodations were reasonable. The Court further finds that a reasonable trier of fact could conclude that DOTD failed to engage in the interactive process regarding Schilling's requests for the reinstallation of a door to her office in 2007 and 2008. Accordingly, DOTD's motion shall be denied as to Schilling's claims of failure to provide reasonable accommodations and engage in the interactive process as to her request for the reinstallation of an office door.

### c. Recovery of Punitive Damages from Government Agency Under the ADA

As a governmental agency, DOTD correctly argues that, as a matter of law, Schilling is unable to recover punitive damages under the ADA. The law is clear that punitive damages "are unavailable in an ADA action where the defendant is a 'government, government agency or political subdivision.'"[150] The Court further notes, however, that after reviewing the Complaints, Schilling does not appear to be seeking to recover said damages. Nevertheless, to the extent Schilling is seeking punitive damages for her ADA claims, the Court finds that as a matter of law punitive damages are unavailable.

---

[150] *Appleberry v. Fort Worth Independent School Dist.*, 2012 WL 5076039, at *4 (N.D.Tx. Oct. 17, 2012)(quoting 42 U.S.C. § 1981a(b)(1)).

d. <u>Worsening Health</u>

DOTD contends that, because Schilling's treating physicians have not been designated as experts, they cannot testify as to causation or offer an opinion as to whether DOTD's alleged failure to accommodate caused Schilling's health condition to worsen. Putting this argument aside, DOTD further argues that even if the Court were to consider the testimony of Schilling's physicians, D.C. Carter testified that any number of things could have caused Plaintiff's condition to worsen. Schilling does not dispute the fact that D.C. Carter listed other possible causes for Schilling's worsening conditions. However, Schilling argues that D.C. Carter's testimony that DOTD's failure and/or delay in providing her accommodations had a "snowballing effect" on her health, such that she experienced greater stress which exacerbated her inflammation. The Court finds, however, that D.C. Carter's testimony as to causation is speculative as she has not been designated as an expert. Furthermore, while D.C. Carter testified that Schilling's job may have been a factor, she plainly stated that she could not "blame" Schilling's worsening condition "on any one thing."[151]

When the Court turns its attention to the testimony of Schilling's rheumatologist, it becomes more evident that Schilling cannot defeat DOTD's motion on this issue. In particular, Dr. Shannon testified that he did not see an overall change in Schilling's condition from the time he began treating her in 2006 through 2012.[152] He further testified that a person with fibromyalgia "will have good and bad days, depending on multiple factors, and it's not necessarily isolated to a work-related event that's going to affect her overall state of health. It will – it will come into the factors, but there's also

---

[151] Rec. Doc. 41-6, pp. 68-69.
[152] Rec. Doc. 44-6, p. 20.

family situations, there's lifestyle situations, there's socioeconomic situations."[153] Therefore, considering the evidence in a light most favorable to Plaintiff, the Court finds that no reasonable trier of fact could conclude that DOTD's failure to provide reasonable accommodations to Schilling caused her medical conditions to worsen. Hence, DOTD's first *Motion for Partial Summary Judgment* shall be granted as to this issue.

### 2. Analysis of DOTD's Second Motion for Partial Summary Judgment

In its second *Motion for Partial Summary Judgment*, DOTD argues that there are no genuine issues of material fact on Schilling's claims of harassment, retaliation, and intentional infliction of emotional distress. In response, Schilling has filed an opposition in which she counters and addresses each of DOTD's arguments except for one: Schilling's intentional infliction of emotional distress claim. The law is clear that "[i]f a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered on appeal."[154] Considering the arguments and evidentiary support provided by DOTD, the motion for partial summary judgment is granted in favor of DOTD as to Schilling's intentional infliction of emotional distress claim.

#### a. Disability-Based Harassment/Hostile Work Environment Claim

Shilling has alleged that she was harassed and subjected to a hostile work environment in retaliation for requesting reasonable accommodations in violation of the ADA and the LEDL. "In interpreting Louisiana's employment discrimination laws, [Louisiana's state] courts have relied upon federal statutes and the interpreting federal

---

[153] Rec. Doc. 44-6, p. 19.
[154] *Kennan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).

jurisprudence."[155]   Therefore, Plaintiff's workplace harassment claims will be analyzed under the ADA framework.

Disability-based workplace harassment claims under the ADA have been recognized by the Fifth Circuit since 2001.[156]  In order to succeed on such a claim under both the ADA, a plaintiff must demonstrate the following:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.[157]

Within the Fifth Circuit, the legal standard for workplace harassment is high.[158]  "For workplace abuse to rise to the level of an actionable offense the 'disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'"[159]  In determining whether a work environment is abusive, the court must consider the totality of circumstances including such factors as "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance."[160]  "The environment must be deemed 'both objectively and subjectively offensive, one that a

---

[155] *Conine ex rel. Estate of Addie v. Universal Oil Products Co.*, 966 So.2d 763, 767 (La.App. 2 Cir. 9/26/07).

[156] *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229 (5th Cir. 2001)(hereinafter *Flowers*).

[157] *Id.*, at 235-36.

[158] *Gowesky v. Singing River Hosp. Systems*, 321 F.3d 503, 509 (5th Cir. 2003) (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 321 F.3d at 236 (citations omitted)).

[159] *Id.*

[160] *Flowers*, 321 F.3d at 236.

reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"[161]

The bulk of DOTD's argument turns on whether Schilling was subjected to unwelcome harassment. Specifically, DOTD argues that the alleged harassing behavior does not rise to the necessary severe and pervasive nature to create a hostile working environment. DOTD further argues that Shilling does not contest that her complaints were responded to or investigated. In response, Schilling submits that her case is much stronger than the disability-based harassment in *Flowers v. S. Reg'l Physician Servs. Inc.*[162] The Court disagrees.

In *Flowers*, the Fifth Circuit upheld a jury finding that the evidence demonstrated that the conduct to which the plaintiff (Flowers) had been subjected was sufficiently severe and pervasive to constitute harassment. Flowers worked primarily as a doctor's medical assistant at Southern Regional Physician Services, Inc., from September 1, 1993 until November 13, 1995. In early March of 1995, Flowers' immediate supervisor learned of her HIV infection; eight months later, Flowers was terminated. Notably, at the time plaintiff learned of her HIV status, she and her immediate supervisor "were close friends, often going to lunch, drinks, and movies together and once even taking a trip to Mardi Gras in New Orleans."[163] The evidence revealed that almost immediately after Flowers' supervisor learned of her condition, she would no longer go to lunch with her and ceased socializing with her. Flowers' supervisor "began intercepting [her] telephone calls, eavesdropping on her conversations, and hovering around [her]

---

[161] *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)(quoting F*aragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).
[162] *Flowers*, 321 F.3d at 236.
[163] *Id.*

desk."[164]   The evidence also showed that Southern Regionals' president "became very distant [from Flowers], when the two used to get along very well."[165]   He "refused to shake Flowers' hand and would go to great pains to circumvent her office to get to other parts of the hospital."[166]   After revealing her HIV-status to her supervisor, "Flowers was required to undergo four random drug tests within a one-week period;" whereas in the past, she had only been required to submit to one random drug test.[167]   Prior to being informed of Flowers' condition, her immediate supervisor "appeared more than satisfied with Flowers' work performance…However, within the month after revealing her HIV-positive condition to [her supervisor], Flowers was written up for the first time" in approximately one and one-half years.[168]   Thereafter, Flowers was written up two more times and on each instance, placed on a ninety day probation period.   Prior to the second probationary period, Flowers "was lured into a meeting under false pretenses" where the hospital president was in attendance and uttered vulgar sexual accusations.[169]   Within eight months of her immediate supervisor learning of her HIV-status, Flowers was fired.

Unlike *Flowers*, the Court finds after considering the evidence presented by Schilling in a light most favorable to her, no reasonable juror could find that she experienced sufficiently pervasive or severe treatment that altered the conditions of her employment to create a hostile working environment.   The vast amount of evidence

---

[164] *Id.*
[165] *Id.* at 236-37.
[166] *Id.* at 237.
[167] *Id.*
[168] *Id.*
[169] *Id.* Flowers was terminated from her position on November 13, 1995.

produced by Schilling in support of her harassment claim does not rise to the level of frequency or offensiveness as the plaintiff in *Flowers*.

For instance, Schilling focuses on two specific comments made by Connie Standige during the April 22, 2008 meeting with various supervisors to discuss her accommodation requests. During this meeting Schilling testified that Standige commented that she did not like ten hour workdays and then began to "bombard Ms. Schilling with questions that embarrassed her and made her feel humiliated, intimidated, scared, and threatened."[170] Schilling claims Standige also asked her about her leave time, specifically inquiring as follows: "You don't have much leave time. And, you don't have much paid leave time left. Then what are you going to do?"[171] Schilling testified that this made her feel like her job had been threatened. During this same meeting, Shilling also testified that Ms. Standige "sarcastically" asked her if she could go barefoot, and then told Schilling she could go barefoot as long as she could not see her feet. Schilling "found this to be very insulting, degrading, and belittling."

Even if the Court assumes that everything Schilling claims of Standige is true, her actions, while insensitive and rude, would not be sufficient as a matter of law to state a claim of hostile environment harassment.[172] Moreover, the Court finds that, based on the evidence, these isolated comments occurred on only one occasion--during the April 2008 meeting. Schilling testified that outside of this one meeting, Standige never asked her about the amount of leave she had left again or talked to her about

---

[170] Rec. Doc. 42, p. 6.
[171] Rec. Doc. 22-3, p. 123.
[172] See, *McConathy v. Dr. Pepper/Seven-Up Corp.*, 131 F.3d 558, 560, 564 (5th Cir. 1998). The Fifth Circuit found no actionable disability-based workplace harassment where an employer made "insensitive and rude" comments to an employee "that she 'better get well this time,' and that he would 'no longer tolerate her health problems.'"

"going barefoot" again.[173]  In fact, based on her recollection, Schilling testified that these specific issues were never discussed again with her while at District 62.[174]  Such infrequent and isolated statements cannot give rise to a severe and perverse environment necessary for a hostile work environment.   "[A] court must be mindful of the fact that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"[175]  For similar reasons, Schilling's contention that she was being harassed as a result of Tate sharing information about her health conditions on two occasions, or looked at by Standige and Tate two or three times per month, does not create a genuine issue of material fact that she was subjected to a hostile work environment.[176]  Such behavior fails to rise to the level of being severe or pervasive due to the limited occurrences and the nature of the behavior.[177]

Schilling also contends that statements made by Tate and Standige about contacting "legal" amounted to harassment.  However, Schilling testified that she did not know the motive behind the comments.  Schilling testified that she "never could get the gist on what – why they were contacting legal."[178]  Further, Tate testified that she contacted legal when Schilling made her requests under the ADA so she could receive

---

[173] Rec. Doc. 22-3, p. 124.
[174] Rec. Doc. 22-3, pp. 117-18.
[175] *Ballard v. Healthsouth Corp.*, 147 F.Supp.2d 529, 536 (N.D. Tx. 2001)(quoting *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 874 (5th Cir. 1999)).
[176] Schilling admitted that she could not recall Tate making any other such statements.  Schilling further testified that Tate discussed her need for accommodations with her secretary, and with another employee who had requested an accommodation in her schedule.  According to Schilling's testimony, Tate denied one of her co-worker's requested schedule changes because she had denied the same request made by Schilling. Rec. Doc. 22-3, pp. 130-31.
[177] Rec. Doc. 22-3, pp. 125-127.  Schilling further described this behavior as looking her up and down "like they were checking her out."
[178] Rec. Doc. 41-4, pp. 121-22.

guidance as to her responsibilities.[179]   Based on the evidence in the record, it is clear that Schilling cannot show that such statements were directed at her because of her health conditions to amount to harassment.

For similar reasons, Schilling cannot show that an email sent by Standige to all District 62 employees regarding the Dress Code amounts to harassing behavior.   On March 13, 2008, Standige sent her email as a "routine safety policy email" on specific safety policies in effect.[180]   In the email, certain prohibited practices were highlighted, including the requirement that employees must wear DOTD approved safety vests and hard hats or soft caps when exposed to moving roadway traffic, construction equipment, or in work zones.[181]   The email further explained that t-shirts are no longer acceptable, and that slippers and thongs are prohibited for all employees.[182]   Three days later, Schilling's chiropractor sent a request that she be allowed to wear slipper-like shoes to work.[183]   Based on the chronology of events, Schilling simply cannot show that Standige's email was sent because of her request for accommodations to wear slipper-like shoes.

Schilling further testified that she felt she had been harassed because "nothing that she asked for was given to her.  [She] felt like [she] was being made fun of.[184]  She stated that Standige and Tate made a "mockery of [her]" based on the statements made by Standige during the April 2008 meeting and by denying her the schedule change she had requested.  Schilling further testified that she "felt like [she] was being watched" by

---

[179] Rec. Doc. 21-6, p. 2.
[180] Rec. Doc. 22-4.
[181] Rec. Doc. 22-4.
[182] Rec. Doc. 22-4.
[183] Rec. Doc. 22-15.
[184] Rec. Doc. 22-3, p. 116.

Standige and Tate.[185]  The Court finds that the foregoing evidence offered in support of Schilling's harassment claim, turns on Shilling's subjective belief that she was being harassed because of her disability.  However, it is well established that "[a]n employee's subjective belief that he was discriminated against, standing alone, is not adequate evidence to survive a motion for summary judgment."[186] Therefore, such statements standing alone simply do not create a genuine issue of material fact.

Additionally, Schilling's contention that Tate's brief office visit amounted to harassment must also fail.  Schilling testified that at some point after the meeting in April of 2008, Tate stopped by her office one morning with a notebook and folders and stated "Well, I want to see what you do."[187]  The evidence shows that the meeting lasted for approximately one hour to four hours at the most.[188]  Schilling said that would be "fine" and instructed Tate to "[h]ave a seat."[189]  Schilling further testified that she told Tate about her different job functions.  However, Schilling admitted that Standige and Tate "visited everyone's desk to see what everyone did" and that she "was just in the mix."[190] Tate further attested to the fact that her purpose for in observing Schilling, as well as other employees, was so she could be "aware of the duties of each employee under [her] supervision."[191]  Based on the evidence, this one time visit by Schilling's supervisor for the legitimate purpose of observing her job duties does not amount to the necessary severe or pervasive level to be characterized as harassment.

---

[185] Rec. Doc. 22-3, p. 125.
[186] *Raina v. Veneman*, 152 Fed.Appx. 348, 350 (5th Cir. 2005)(citing *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000)).
[187] Rec. Doc. 41-4, p. 218.
[188] Rec. Doc. 22-11; Rec. Doc. 22-6.
[189] Rec. Doc. 41-4, p. 218.
[190] Rec. Doc. 41-4, p. 218-19.
[191] Rec. Doc. 22-6, p. 1.

And yet, even if the Court were to assume, *arguendo*, that Schilling had been subjected to severe or pervasive harassment, her claim would still fail as she cannot, and has not attempted to show that the alleged harassment affected a term, condition, or privilege of employment.[192] Schilling testified to the fact that while she was employed at DOTD she was never demoted, issued a letter of reprimand or counseling, or ever suspended from work.[193] She further testified that she never received a negative rating on a performance review, had her work hour involuntarily reduced, or was transferred to another job or location.[194] In addition, Schilling's salary was never reduced, and unless there was a freeze on all employee raises, she continued to receive her annual raise yearly.[195] The evidence further shows that DOTD considered Schilling to be a model employee and recognized her as District 62's employee of the quarter in October of 2008.[196] Rylatt also testified that Schilling always received "above average" ratings on her performance evaluations.[197]

Accordingly, the Court finds that, considering all of the evidence in the light most favorable to Schilling, she has failed to satisfy her burden of creating a genuine issue of material fact to defeat summary judgment on her harassment claim. Hence, DOTD's motion shall be granted as to Schilling's claim for disability-based workplace harassment/hostile work environment.

---

[192] In her opposition, Schilling states that DOTD's repeated denials of her requests for reasonable accommodations "stressed her out terribly and affected her work." Rec. Doc. 42, p. 13.
[193] Rec. Doc. 44-2, pp. 141-42.
[194] Rec. Doc. 44-2, pp. 141-43.
[195] Rec. Doc. 44-2, pp. 141 and 143.
[196] Rec. Doc. 44-11, p. 8.
[197] Rec. Doc. 44-9, p. 3.

b.  Retaliation Claims: Based on Reasonable Accommodations

DOTD contends that Schilling's claims of retaliation must be dismissed because she cannot establish a *prima facie* case of retaliation.   Specifically, Schilling cannot show an adverse employment action, she cannot establish a causal connection, and DOTD has a legitimate, non-discriminatory reason for its actions.   DOTD further argues that even if Schilling could satisfy her burden, she cannot show that her disability was the "but for" cause of DOTD's decision.

To establish a *prima facie* case of unlawful retaliation, a plaintiff must show that (1) she engaged in an activity protected by the ADA, (2) she suffered an adverse employment action, and (3) a causal connection between the protected act and the adverse action.[198] If the plaintiff establishes his *prima facie* case of retaliation, then the "defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action.  If that reason is provided, Plaintiff must produce evidence that the proffered reason is a pretext and that but for his protected activity, the adverse employment action would not have occurred."[199]   In other words, "the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred."[200]

The parties dispute whether Schilling can establish the second and third elements necessary to establish a *prima facie* claim of retaliation.  As to the second element, to prove that an employer took an adverse employment action of "sufficient seriousness to support" a retaliation claim "a plaintiff must show that a reasonable

---

[198] *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).
[199] *Butler v. Exxon Mobil Corp.*, 838 F.Supp.2d 473, 495 (M.D.La. 2012)(citing *Tabatchnik v. Continental Airlines*, 262 Fed.Appx. 674, 676 (5th Cir. 2008)(unpublished opinion)(2008 WL 248595)).
[200] *Seaman v. CSPH*, 197 F.3d 297, 301 (5th Cir. 1999).

employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[201]

Considering the third element, "[a] 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity."[202] The Fifth Circuit has recognized three indicia of causation in the context of employment retaliation: "(1) the absence of any reference to the conduct at issue in the employee's disciplinary record, (2) deviation from the employer's customary 'policy and procedures in terminating the employee,' and (3) temporal proximity between the termination and protected conduct."[203] The Fifth Circuit has also explained that "[t]he timing of the adverse employment action can be a significant, although not necessarily determinative, factor."[204]

Schilling contends that the following actions constitute adverse employment actions under the ADA: (1) the instances she asserted as harassment; (2) the change in Schilling's work schedule to five (5) eight (8) hour days; and (3) Schilling's termination. As an initial matter, the Court adopts its prior analysis and finding that Schilling did not suffer an adverse employment action as a result of her alleged harassment, and further finds for the same reasons, that Schilling cannot satisfy her *prima facie* case of

---

[201] *Picard v. St. Tammany Parish*, 611 F.Supp.2d 608, 625 (E.D.La. 2009)(quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[202] *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001)(quoting *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)).

[203] *Stewart v. RSC Equipment Rental, Inc.*, 485 Fed.Appx. 649, 653 (5th Cir. 2012)(quoting *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)).

[204] *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995). *See also*, *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992). In fact, the Fifth Circuit has held that the existence of a causal nexus when 14 months had lapsed between the protected activity and the adverse employment, where a party did not rely on temporal proximity alone; rather the plaintiff offered additional evidence that only after filing her EEOC Complaint, did her employer complain to her about filing her EEOC Complaint and criticize her work performance. See also *Russell v. University of Texas of Permian Basin*, 234 Fed.Appx. 195 (5th Cir. 2007) (discussing temporal proximity).

retaliation as to this claim.  However, the Court will address whether the remaining two actions satisfy the adverse and causal connection elements necessary to establish a *prima facie* case of retaliation below.

i.    Business Section Employees' October 2008 Schedule Change

Schilling contends that her schedule changed in October of 2008 in retaliation for other requests she had made for a modified schedule.  DOTD admits that Tate informed all of the business section employees on October 23, 2008, that a new work schedule would be going into effect on November 3, 2008, that would apply across the board. Specifically, all business section employees working in District 62 would have five (5) eight (8) hour workdays.  Learning of this new schedule change, Schilling made a request under the ADA to have her schedule changed back to four (4) nine (9) hour days with half a day on Friday.

The Court finds the fact that Schilling sought to have her schedule revert back to its previous schedule is significant, because it shows that she was not dissuaded from requesting an accommodation to her schedule.  This works against Schilling's argument that this schedule change was a materially adverse employment action.   Recently this this Court, relying on sound Fifth Circuit jurisprudence, also found that a change in an employee's work schedule did not rise to a material adverse employment action because it was basically a shift change that had no effect on compensation or the total hours worked.[205]   In Schilling's case, she, like all of the employees in District 62's business section, would have to work five (5) eight (8) hour days per week.  Schilling has neither argued nor presented evidence showing that this shift change altered the

---

[205] *McKneely v. Zachary Police Dept.*, 2013 WL 4585160, *10 (M.D.La. Aug. 28, 2013) (discussing *Lusute v. Louisiana Dept. of Social Services*, 479 F. App'x 553, 2012 WL 1889684, *2 (5th Cir. May 25, 2012)(citing *Hunt v. Rapides Healthcare Syst., L.L.C.*, 277 F.3d 757, 769 (5th Cir. 2001))

number of hours she was required to work or her compensation. Hence the Court finds that this change in schedule did not amount to an adverse employment action.

Even assuming that the October 2008 schedule change amounted to an adverse employment action, Schilling could not carry her burden of establishing a *prima facie* case of retaliation because she could not satisfy the causation element. Schilling contends that the modified schedule was implemented based upon a request she made six months earlier for a schedule change. The sixth month gap in time between Schilling's requested modification in her schedule in April of 2008 and the October 2008 District 62 schedule change is too far apart, without more, to establish a causal connection.[206] As additional evidence, Schilling offers her own testimony that she felt the schedule change was retaliatory based on Tate's previous comment that she was tired of accommodating people.[207] Therefore, the Court finds that the additional evidence offered by Plaintiff to show causation—her own subjective belief and conclusory allegations about Tate's decision being retaliatory—is insufficient to defeat summary judgment and does not lend itself to establishing the causation element.[208] Accordingly, the Court finds that DOTD's motion shall be granted as to this retaliation claim.

ii.    Schilling's May 2012 Termination

Schilling contends that her May 7, 2012 termination from DOTD was in retaliation for her recurring exercises of protected activities. She argues that as DOTD's continued denials of her requests from 2008 up until her termination required her to use and

---

[206] *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002)(holding that five month period alone is insufficient to establish a causal link).
[207] Rec. Doc. 44-2, pp. 147-49.
[208] *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).

ultimately exhaust her leave resulting in her termination. Schilling's wrongful discharge claim was subject of her 2012 EEOC Charge of Discrimination; Schilling recently received her Right to Sue letter and it has been filed into the record as part of her Amended Complaint.[209]

DOTD does not contend that Schilling cannot satisfy the first two elements of her *prima facie* case. Rather, the focus of DOTD's argument is on the causal connection, and DOTD's legitimate non-discriminatory reason for terminating Schilling. While the Court agrees with Schilling's position that it may consider the intervening period of time for other evidence of retaliatory animus and that recurring retaliatory animus may be sufficient to satisfy the elements of causation, the time periods are far too attenuated to enable Schilling to show causation here.

Relying on Schilling's own documented evidence within her first EEOC Charge, Schilling's requests for reasonable accommodations of her supervisors span from 2007 through 2009. She also documented her 2010 Complaint to DOTD Compliance which was joined by several of her co-workers regarding their individual requests. Other than this, Schilling documented no additional requests for accommodations past that point in time leading up to her termination on May 16, 2012.[210] And yet, the evidence does show that during this three year time span, certain accommodations Schilling had requested were actually provided to her, including her handicap parking spot in the rear of the building, the door to her office was reinstalled, and she had reverted back to the four nine hour days and one half day work schedule. The Court finds that, when it considers the intervening time period between Schilling's original requests for

---

[209] Rec. Doc. 54 and Rec. Doc. 55-1.
[210] Rec. Doc. 13-2.

accommodations and her termination, the activities are far too attenuated to be deemed causally related. Accordingly, the Court finds that Schilling has failed to produce any evidence that creates a genuine issue of material fact that could lead a reasonable trier of fact to find that her termination was causally connected to her requests under the ADA.

Even assuming Schilling could establish *prima facie* case, DOTD has articulated a legitimate non-discriminatory reason for her termination and Plaintiff cannot show that it fired her "but for" her repeated requests for accommodations. The undisputed evidence shows that Schilling went on leave on October 11, 2011 and did not return to work thereafter.[211] DOTD has provided additional evidence that shows that on December 5, 2011, Schilling exhausted all of her FMLA leave, and that as of November 15, 2011, Schilling had less than eight hours of sick leave.[212] The evidence further shows that, in spite of her absence and lack of leave time, DOTD did not terminate Schilling from her position at DOTD until May 16, 2012.[213] Schilling's termination was described as a Non-Disciplinary Removal and authorized under Civil Service Rule 12.6(a)(1) since Schilling was "unable to perform the essential functions of [her] job due to illness or medical disability and [she had] fewer than eight (8) hours of sick leave to [her] credit and [her] job must be performed without further interruption."[214] As a non-disciplinary, no-fault separation, Schilling was not disqualified from certain re-employment opportunities.[215] Additionally, another district court within the Fifth Circuit recently found that an employer had produced evidence of a legitimate,

---

[211] Rec. Doc. 22-8.
[212] Rec. Doc. 22-8; Rec. Doc. 22-9.
[213] Rec. Doc. 22-8.
[214] Rec. Doc. 22-8.
[215] Rec. Doc. 22-8.

nondiscriminatory reason for terminating an employee because she had exhausted her FMLA leave and failed to return to work after her FMLA leave was exhausted.[216] Accordingly, the Court finds that DOTD has satisfied its burden of production in support of its legitimate, nondiscriminatory reason for Schilling's termination.

Because DOTD has satisfied its burden, Schilling must adduce sufficient evidence that the proffered reason is merely pretext for retaliation. Essentially, Schilling "must show that 'but for' the protected activity, the adverse employment action would not have occurred."[217] Schilling relies upon an award she received in October of 2008 where she was recognized as the employee of the quarter. According to the award, Schilling was described as "one of District 62's greatest assets," "meticulous and well organized," "a team player," someone who "never leaves a job undone and works sick many days to ensure that the District's needs are met," and "was able to create Purchase Orders to extend funding, thereby enabling the District to utilize these funds despite the extreme stress she was under."[218] The Court finds that while this evidence shows that Schilling was able to perform her job functions in 2008, it does not show that DOTD's proffered reason for her termination in 2012—over three years after she was recognized as the employee of the quarter and for exhaustion of her leave—was pretextual. If anything, this evidence calls into question whether Schilling was, in fact, qualified for her position during her six month absence from work.

Schilling also refers to her deposition testimony wherein she stated it was her belief that had her requests for reasonable accommodations been granted and her

---

[216] *Johnson v. Dallas County Southwestern Institute of Forensic Science & Medical Examiner Dept.*, 2014 WL 177284, *7 (N.D.Tx. Jan. 16, 2014).
[217] *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).
[218] Rec. Doc. 44-11.

stress level reduced, she would not have had to exhaust as much leave, and therefore, would not have been terminated for exhausting her leave. Once again, however, Schilling's own subjective beliefs cannot satisfy her burden of production on summary judgment. Accordingly, the Court finds that Schilling has failed to produce evidence that would enable a reasonable jury to find that DOTD's proferred reason for terminating Schilling's employment is pretextual. Hence, DOTD's second *Motion for Partial Summary Judgment* shall be granted as to Schilling's retaliation claim arising out of her termination.

### III.    CONCLUSION

Accordingly, the first *Motion for Partial Summary Judgment*[219] filed by Defendant, Department of Transportation and Development (DOTD) is hereby GRANTED IN PART and DENIED IN PART. Furthermore, the second *Motion for Partial Summary Judgment*[220] filed by Defendant, Department of Transportation and Development (DOTD) is hereby GRANTED and Schilling's claims of intentional infliction of emotional distress, disability-based workplace harassment/hostile work environment arising under the ADA and LEDL, and retaliation claims arising under the ADA are hereby dismissed with prejudice in favor of DOTD.

As to DOTD's first *Motion for Partial Summary Judgment*, the motion is GRANTED as to the prescription of Schilling's claims for failure to accommodate arising out of her April 2008 request for a modified work schedule and failure to engage in the interactive process; Schilling's claim for failure to accommodate her four (4) ten (10) hour schedule request; Schilling's claim for punitive damages; and Schilling's claim that

---

[219] Rec. Doc. 21.
[220] Rec. Doc. 22.

DOTD's failure to provide her with reasonable accommodations caused her health to worsen. Accordingly, these claims shall be dismissed with prejudice in favor of DOTD.

DOTD's first *Motion for Partial Summary Judgment* is DENIED as to Schilling's qualification as an individual with a disability, and as to Schilling's claims for failure to accommodate and failure to engage in the interactive process arising out of her requests for a handicapped parking spot, to wear slipper-like shoes to work, and for the reinstallation of a door to her office.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on July 28, 2014.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**